## Case No. 14,731.

### UNITED STATES v. CARR et al.

[3 Sawy. 477.] [1]

Circuit Court, D. California. Sept. 27, 1875.[2]

PUBLIC LANDS — CALIFORNIA—TITLE—APPROPRIATION FOR PUBLIC USES—DEDICATION—GRANT.

1. The title of the city of San Francisco, under the Mexican law, was so far subject to the control of the former government, previous to the conquest and cession of the country, and of the United States subsequently, that portions of the lands within the limits claimed by the city could have been reserved by those governments, respectively, for public purposes at any time before the title had become, by action of the authorities of the city, vested in private parties.

2. As against parties having no title in themselves, holding by intrusion, mere trespassers, the possession of the government for a hospital for infirm and disabled seamen, of a part of the four lots in the city of San Francisco, upon which the hospital is situated, under a deed from the city authorities, with claim to the remainder of the lots for the same purposes, and the assertion of that claim by the removal of the intruders, is an occupation for public uses of the whole premises, within the meaning of the act of congress of 1864 [13 Stat. 333], which excepts from the grant to the city "all sites or other parcels of land" which had been or were then occupied for such uses by the United States.

[Cited in People v. Monk, 28 Pac. 1116.]

3. The setting apart of the premises for a hospital by direction of the government, with the appropriation by congress of moneys to the support of the institution, the construction of buildings thereon, and inclosure of the land, show a dedication of the premises for a public use within the meaning of the decree and confirmatory act of March 8, 1866 [14 Stat. 4], both of which excepted from confirmation to the city parcels of land which had been previously reserved or dedicated to public uses.

This suit was brought to quiet the title to four fifty-vara lots, situated within the city of San Francisco, upon two of which stands the United States Marine Hospital.

In June, 1851, commissioners for the construction of public buildings in San Francisco, appointed by the secretary of the treasury, selected a place on what is known as "Rincon Point" in the city, as a suitable site for a marine hospital. Previous to the selection, and on the thirtieth of September, 1850, congress had appropriated the sum of fifty thousand dollars for the construction of a marine hospital, to be located by the secretary of the treasury at or near San Fran-

cisco. In August, 1852, and in August, 1854, further appropriations were made for the completion of the building, and the arrangement and inclosure of the grounds upon which it is situated. But previous to the commencement of the building the commissioners applied to the city authorities of San Francisco for a conveyance of the city's interest in the land which had been selected. In accordance with this application an ordinance was passed by the common council of the city, directing the mayor to execute a conveyance of the right, title and interest of the city to a block of land consisting of six fifty-vara lots, four of which constitute the premises in controversy. Subsequently the hospital was erected on two of the lots, numbered one and two of the blocks; and outstanding buildings connected with the hospital were constructed on two others of the lots, numbered three and four of the block; and these two were inclosed by a high fence connecting with the building. It is upon this deed and the subsequent use of the lots for a marine hospital that the United States rely. At the time the United States took possession of lots three and four there were several persons upon them, some of whom voluntarily left, and others were removed by the marshal of the United States. The defendants claim under parties thus dispossessed, and assert title to the premises under an ordinance of the city of San Francisco, known as the "Van Ness Ordinance," from its author, passed on the twentieth of June, 1855. By that ordinance the city relinquished and granted all her right and claim to the lands within her corporate limits, as defined by the charter of 1851, to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or if interrupted by an intruder or trespasser, had been or might be recovered by legal process. This ordinance was ratified and confirmed by the legislature of California on the eleventh of March, 1858. On the first of July, 1864, congress passed an act entitled "An act to expedite the settlement of titles to land in the state of California," by the fifth section of which, all the right and title of the United States to the lands within the corporate limits of the city of San Francisco, as defined by her charter of April 15, 1851, were relinquished and granted to the said city and its successors, for the uses and purposes specified in the ordinance of said city, there being excepted from this relinquishment and grant "all sites or other parcels of land" which had been or then were "occupied by the United States for military, naval, or other public uses." 13 Stat. 333. At the time the Van Ness ordinance was passed, the city of San Francisco asserted title, as successors of a Mexican pueblo, to four square leagues of land covering the site of the present city, and

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

2 [Affirmed in 98 U. S. 433.]

had exhibited her claim to the board of land commissioners created under the act of March 3, 1851 [9 Stat. 631]; and the board had confirmed the claim to a portion of the land, and rejected it for the residue. The city not being satisfied with the portion adjudged to her, prosecuted an appeal from the decision of the board to the United States district court, from which court the case was transferred to the circuit court of the United States for the district of California. That court adjudged the claim of the city to be valid to four square leagues of land subject to certain exceptions and reservations; and on the eighteenth of May, 1865, its final decree in the case was entered, which is as follows:

"Final Decree Confirming the Claim of the City of San Francisco to its Pueblo Lands, 1865. The City of San Francisco v. The United States. The appeal in this case taken by the petitioner, the city of San Francisco, from the decree of the board of land commissioners to ascertain and settle private land claims in the state of California, entered on the twenty-first day of December, 1854, by which the claim of the petitioner was adjudged to be valid, and confirmed to lands within certain described limits, coming on to be heard upon the transcript of proceedings and decision of said board, and the papers and evidence upon which said decision was founded, and further evidence taken in the district court of the United States for the Northern district of California pending said appeal—the said case having been transferred to this court by order of the said district court, under the provisions of section four of the act entitled 'An act to expedite the settlement of titles to lands in the state of California,' approved July 1, 1864—and counsel of the United States and for the petitioner having been heard, and due deliberation had, it is ordered, adjudged and decreed, that the claim of the petitioner, the city of San Francisco, to the land hereinafter described, is valid, and that the same be confirmed. The land of which confirmation is made is a tract situated within the county of San Francisco, and embracing so much of the extreme upper portion of the peninsula above ordinary high-water mark (as the same existed at the date of the conquest of the country, namely, the seventh of July, A. D. 1846) on which the city of San Francisco is situated, as will contain an area of four square leagues—said tract being bounded on the north and east by the Bay of San Francisco; on the west by the Pacific Ocean; and on the south by a due east and west line drawn so as to include the area aforesaid, subject to the following deductions, namely: such parcels of land as have been heretofore reserved or dedicated to public uses by the United States; and also such parcels of land as have been by grants from lawful authority vested in private proprietorship, and have been finally confirmed to parties claiming under said grants by the tribunals of the United States, or shall hereafter be finally confirmed to parties claiming thereunder by said tribunals, in proceedings now pending therein for that purpose; all of which said excepted parcels of land are included within the area of four square leagues above mentioned, but are excluded from the confirmation to the city. This confirmation is in trust, for the benefit of the lot holders under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue, in trust for the use and benefit of the inhabitants of the city. Field, Circuit Judge. San Francisco, May 18, 1865."

From this decree the United States and the city of San Francisco appealed—the United States from the whole decree, and the city from so much thereof as included certain lands reserved for public purposes in the estimate of the quantity confirmed. Whilst the appeal was pending in the supreme court of the United States, congress passed the following act: "An act to quiet the title to certain lands within the corporate limits of the city of San Francisco: Be it enacted by the senate and house of representatives of the United States of America in congress assembled: That all the right and title of the United States to the land situated within the corporate limits of the city of San Francisco, in the state of California, confirmed to the city of San Francisco by the decree of the circuit court of the United States for the Northern district of California, entered on the eighteenth day of May, one thousand eight hundred and sixty-five, be, and the same are hereby relinquished and granted to the said city of San Francisco and its successors, and the claim of the said city to said land is hereby confirmed, subject, however, to the reservations and exceptions designated in said decree, and upon the following trusts, namely, that all the said land, not heretofore granted to said city, shall be disposed of and conveyed by said city to parties in the bona fide actual possession thereof by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the state of California may prescribe, except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses: provided, however, that the relinquishment and grant by this act shall not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof, whether derived from Spain, Mexico, or the United States, or preclude a judicial examination and adjustment thereof. Approved March 8, 1866." At the December term of the supreme court of the United States for 1866—the term following the passage of the above act—the appeal of the United States and the appeal of the city of San Francisco, in the Pueblo Case, were both dismissed, by stipulation of counsel of the respective parties. See Townsend v. Greely, 5 Wall. [72 U. S.] 337, and Grisar v. McDowell, 6 Wall. [73 U. S.] 379.

Walter Van Dyke, U. S. Atty.

William Matthews and J. E. McElraith, for defendants.

FIELD, Circuit Justice. This is a suit on the equity side of the court to quiet the title of the United States to four fifty-vara lots constituting the southeasterly half of the block bounded by Harrison, Spear, Folsom and Main streets, in the city of San Francisco. And the principal question for determination is, whether these lots were excepted from the confirmation to the city by the decree of the circuit court of the United States in the Pueblo Case, and the legislation of congress. It is unnecessary to go into any examination of the character of the city's title under the Mexican law; that subject has been elaborately considered in several adjudications of this court. It is sufficient for the purposes of this case to state that the title was so far subject to the control of the former government, previous to the conquest and cession of the country, and of the United States subsequently, that portions of the lands within the limits claimed by the city could have been reserved by those governments, respectively, for public purposes at any time before the title had become, by action of the authorities of the city, vested in private parties. It was, therefore, competent for the United States to set apart the premises in question, if not thus vested in private parties, for the erection of a hospital for disabled and infirm seamen, or for any other public purpose, at any time previous to the decree of the circuit court in the Pueblo Case, and the confirmatory act of congress of March 8, 1866, unless their right was relinquished by the fifth section of the act of July 1, 1864. That act relinquished and granted to the city the interest and right of the United States to lands within the charter limits of 1851, for the uses and purposes of the Van Ness ordinance; but it expressly excepted from its operation "all sites or other parcels of land" which had been or were then occupied by the United States for public uses.

The decree of the circuit court in the Pueblo Case also excepted from confirmation to the city, parcels of land which had been previously reserved or dedicated to public uses; and the confirmatory act of congress of 1866 provided for the same reservations.

It is clear from the evidence presented in the case, and from the whole history of the action of the government with respect to the Marine Hospital, that the United States have claimed the right to the four lots in controversy since the deed of the city, executed in December, 1862; and that at the date of the decree in the Pueblo Case, and the confirmatory act of congress, they were in possession of the premises under their deed, or at least of a part of them, using such part for the hospital, with claim to the balance for the same purpose. As against parties having no title in themselves, holding by intrusion,

mere trespassers, this possession of the government of a part of the lots with claim to the balance under the deed, and the assertion of that claim by the removal of the intruders, is an occupation of the whole premises for a public use, within the meaning of the act of congress of 1864. And the setting apart of the premises for a hospital by direction of the government, with the appropriation by congress of moneys to the support of the institution, the construction of buildings thereon, and inclosure of the land, show a dedication of the premises for a public use within the meaning of the decree and confirmatory act.

The defendants rest all their claim upon rights acquired by possession under the Van Ness ordinance. But that ordinance could not apply to lots covered by the previous deed of the city, executed in December, 1862. That deed, it is true, was inoperative against a previous conveyance of the city to the commissioners of the funded debt, or grantees from them, but it was operative against any further disposition of the premises by the city, if any interest remained in the corporation. The Van Ness ordinance could not embrace lands in which the city's interest had been thus disposed of, for that ordinance only purported to give such interest as the city held. Of necessity, it could give no more. Hubbard v. Sullivan, 18 Cal. 508. The defendants had, therefore, no standing even under the Van Ness ordinance, but were simple intruders whose possession, if it existed as claimed, was, whilst it lasted, illegal and tortious.

The United States must have a decree to quiet the title, and declaring that the claim and assertion of an adverse interest by the defendants in the premises in controversy is without any just right and wholly invalid. And it is so ordered.

[Affirmed by the supreme court. 98 U. S. 433.]